## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BARBARA GOUDY-BACHMAN** and **GREGORY BACHMAN** | : | **CIVIL ACTION NO. 1:10-CV-763** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, KATHLEEN SEBELIUS, in her official capacity as the Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF THE TREASURY, and TIMOTHY F. GEITHNER, in his official capacity as Secretary of the United States Department of the Treasury** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

One of the benefits of the myriad challenges to the constitutionality of the Patient Protection and Affordable Care Act (hereinafter "Health Care Act" or the "Act"), Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Affordability Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, is the distillation of relevant issues.  As a threshold matter, I emphasize, as Judge Vinson emphasized in Florida v. U.S. Department of Health & Human Services, --- F. Supp. 2d ---, 2011 WL 285683 (N.D. Fla. 2011), that this case is not about whether the Health Care Act merely treats the symptoms or cures the disease which has so clearly afflicted our health care system.  Nor is it about the exhaustive

efforts of Congress to document and to project the increasing costs of health care services or to pinpoint discriminatory practices associated with pre-existing conditions.

Rather, this case concerns the precise parameters of Congress's enumerated authority under the Commerce Clause of the United States Constitution. Specifically, the issue is whether Congress can invoke its Commerce Clause power to compel individuals to buy insurance as a condition of lawful citizenship or residency.  The court concludes that it cannot.  The power to regulate interstate commerce does not subsume the power to dictate a lifetime financial commitment to health insurance coverage.  Without judicially enforceable limits, the constitutional blessing of the minimum coverage provision, codified at 26 U.S.C. § 5000A, would effectively sanction Congress's exercise of police power under the auspices of the Commerce Clause, jeopardizing the integrity of our dual sovereignty structure.

## I.    STATEMENT OF FACTS

The court set forth relevant facts in its January 24, 2011 decision, Goudy-Bachman v. U.S. Department of Health and Human Services, 764 F. Supp. 2d 684 (M.D. Pa. 2011), familiarity with which is presumed.  Nevertheless, in the context of cross-motions for summary judgment, certain facts deserve reiteration and emphasis.[1]

---

[1]  Pursuant to Local Rule 56.1 the parties submitted Statements of Material Fact with their respective summary judgment motions.  (See Docs. 45, 50).  Neither

Plaintiffs Barbara Goudy-Bachman and Gregory Bachman, a married couple with two children, reside in Etters, York County, Pennsylvania. (Doc. 47-2 ¶¶ 1-3; Doc. 50 ¶ 7). They instituted this suit to challenge the constitutionality of the requirement to maintain minimum essential coverage (hereinafter either "the minimum coverage provision" or "the individual mandate").[2] Barbara is 48 years old, and Gregory is 56 years old. (Doc. 50 ¶¶ 8-9). They are self-employed and do not carry health insurance. (Doc. 47-2 ¶ 10; Doc. 50 ¶ 16). Neither currently qualifies for Medicaid and neither will qualify for Medicare before January 1, 2014, when the individual mandate takes effect. (Doc. 50 ¶ 8; see also Doc. 47-2 ¶ 4). Barbara and Gregory are also not members of any group that is exempt from the individual mandate and, hence, they will be subject to the mandate when it takes effect on January 1, 2014. (Doc. 47-2 ¶¶ 2, 5-7; Doc. 50 ¶¶ 10-13).

The Bachmans do not dispute that there is a health care crisis that is national in scope. To the contrary, the Bachmans' personal financial decisions exemplify the Hobson's choice of family budgets across the country that lies at the

---

party contests the factual assertions presented in the Local Rule 56.1 Statements of Material Fact. (See Transcript of July 21, 2011 Hearing, at 2-3 [hereinafter "Tr."]). The court commends counsel for their cooperative resolve to establish a factual record, thereby facilitating this court's consideration of the Rule 56 motions.

[2] The court inquired at oral argument whether the government considered the term "individual mandate" to be pejorative and whether the government had a preferred moniker for the Act's insurance requirement, codified at 26 U.S.C. § 5000A. (See Tr. at 58-59). The government expressed no preference. (Id.) Moreover, the Third Circuit has recently employed the term "individual mandate" to refer to this provision. N.J. Physicians Inc. v. Obama, --- F.3d ---, 2011 WL 3366340 (3d Cir. 2011).

very core of the health care crisis.  They dropped all health insurance coverage in

2001 because their insurance premiums exceeded their mortgage payments.  (Tr. at

10-11).  The insurance that the Bachmans had maintained was of limited use in that

it covered only eighty percent (80%) of qualified expenses and imposed a twenty

percent (20%) deductible per occurrence.  (Id.)  Since terminating their health

insurance coverage, the Bachmans have incurred medical expenses for various

health care services, and have paid these expenses in full out of current assets.

## II.   PROCEDURAL HISTORY

On April 12, 2010, the Bachmans filed the instant action facially challenging

the constitutionality of 26 U.S.C. § 5000A, the individual mandate.  The Bachmans

seek a declaration that the individual mandate specifically, and the entire Act as a

whole, violate Article I, § 8 of the United States Constitution.  They seek to enjoin

enforcement of the individual mandate.

On June 14, 2010, the government filed a motion to dismiss (Doc. 11)

asserting jurisdictional and merits-based grounds for dismissal.  On January 24,

2011, the court issued a Memorandum and Order denying the government's motion

to dismiss on jurisdictional grounds.  (Doc. 37).  The court concluded that the

Bachmans adequately alleged standing to bring the challenge and that the action

was not barred by the Anti-Injunction Act.[3]  (Doc. 37).  The court indicated that a

---

[3]  The court's conclusions with respect to standing remain unchanged at this later procedural posture.  See Freeman v. Corzine, 629 F.3d 146, 153 (3d Cir. 2010) (noting that at the summary judgment stage a plaintiff's unsubstantiated allegation of standing is insufficient; instead a plaintiff "must set forth by affidavit or other

4

separate opinion would issue addressing the government's merits-based contention

that the Bachmans fail to state a claim upon which relief can be granted.  Prior to

issuance of that opinion, the parties stipulated to the modification of the

government's motion to dismiss with a motion, in the alternative, for summary

judgment.  (Doc. 41).  The court approved the joint stipulation on June 10, 2011

(Doc. 42), and on June 21, 2011, the government filed a motion for summary

judgment (Doc. 43) with numerous exhibits.  (See Doc. 45, Exs. 1-24; Doc. 46, Exs.

25-51).  The Bachmans filed a cross-motion for summary judgment (Doc. 47) on

July 6, 2011.  The court heard oral argument on the cross motions on July 21, 2011.

---

evidence specific facts demonstrating that [the standing] requirements have been
met" (internal citations and quotations omitted)).  The Bachmans have adequately
alleged through affidavit an injury in fact.  (See Doc. 47-2 ¶¶ 12, 16, 17); Lujan v.
Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  They assert that the impending
mandate has forced them to reorder their financial affairs and alter their spending
habits.  (See Doc. 47-2 ¶¶ 12, 16, 17); see also Thomas More Law Ctr. v. Obama, ---
F.3d ---, 2011 WL 2556039, at *2-6 (6th Cir. 2011) (concluding that plaintiffs
established both actual and imminent injury sufficient to confer standing where
plaintiffs declared that the individual mandate required them to change their
present spending and saving habits); id. at *5 ("The plaintiffs claim a constitutional
right to be free of the minimum coverage provision, and the only thing saving them
from it at this point is two and a half more years and an exceedingly concrete 'some
day': January 1, 2014.").  Specifically, the Bachmans have refrained from financing
a suitable new car of their choosing—a purchase they could otherwise
afford—because they will be unable to satisfy the payments on a new vehicle when
the individual mandate comes into force.  (Doc. 50 ¶ 21; Doc. 47-2 ¶ 16).  Unlike the
plaintiff in New Jersey Physicians, Inc. v. Obama, --- F.3d ---, 2011 WL 2266340 (3d
Cir. 2011), who asserted minimal allegations of injury, the Bachmans sufficiently
posit actual and imminent injury stemming from the individual mandate.  See id. at
*4 ("There are no facts alleged to indicate that Roe is in any way presently impacted
by the Act or the mandate.  This case is thus unlike some of the other pending
health care challenges, in which the plaintiffs alleged or demonstrated that they
were experiencing some current financial harm or pressure arising out of the
individual mandate's looming enforcement in 2014.").

Subsequent to oral argument, the parties filed supplemental briefing on the most

recent opinion from the Eleventh Circuit in <u>Florida ex rel. Attorney General v. U.S.</u>

<u>Department of Health & Human Services</u>, --- F. 3d ---, 2011 WL 3519178, at *24-35

(11th Cir. 2011).  (<u>See</u> Docs. 59, 60).  The motions have been fully briefed and are

now ripe for disposition.[4]

---

[4]  The court will not address the government's argument that the minimum coverage provision is a valid exercise of Congress's authority under the General Welfare Clause.  (<u>See</u> Doc. 44, at 38-42); U.S. CONST. art. I, § 8, cl. 1.  Although Congress's power under the clause is extensive, <u>see</u> <u>License Tax Cases</u>, 72 U.S. 462, 471 (1866), and the power may be used to reach a broad spectrum of legislative purposes, <u>United States v. Sanchez</u>, 340 U.S. 42, 44-45 (1950), the court previously concluded that the minimum coverage provision is not a tax, thereby precluding any argument that the General Welfare Clause provides an independent constitutional basis for the enactment of the minimum coverage provision.  (<u>See</u> Doc. 37, at 18-24); <u>Goudy-Bachman</u>, 764 F. Supp. 2d at 695-97.

The Act itself belies any contention that Congress intended to invoke its powers under the General Welfare Clause.  Congress clearly asserted that its authority to enact the minimum coverage provision lay in the Commerce Clause.  <u>See</u> Pub. L. No. 111-148, § 1501(a) as amended by Pub. L. No. 111-152, § 10106(a); <u>see</u> <u>also</u> <u>Thomas More Law Ctr.</u>, --- F.3d at ---, 2011 WL 2556039, at *18 (Sutton, J., concurring for a majority of the court) ("Words matter, and it is fair to assume that Congress knows the difference between a tax and a penalty, between its taxing and commerce powers, making it appropriate to take Congress at its word. . . . The findings say nothing about, or even suggestive of, the taxing power."); <u>Mead v.</u> <u>Holder</u>, 766 F. Supp. 2d. 16, 41 (D.D.C. 2011).

III.   **STANDARD OF REVIEW**[5]

Through summary adjudication the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(a).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(a), (c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

The court is permitted to resolve cross-motions for summary judgment concurrently.  See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008) (citing Rains v. Cascade Indus. Inc., 402 F.2d 241, 245 (3d Cir. 1968)); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998).  When doing so, the court is bound to view the evidence in the light most favorable to the

---

[5]  The court construes the government's motions (Docs. 11, 43) as a motion for summary judgment so that it may consider the Exhibits submitted in support thereof.  See FED. R. CIV. P. 12(d).  Per stipulation, prior briefing submitted in connection with the government's motion to dismiss has been incorporated.  (See Doc. 42 ¶ 2).

non-moving party with respect to each motion.  FED. R. CIV. P. 56; see also

Lawrence, 527 F.3d at 310.  In the instant matter, the challenge to the individual

mandate presents a pure question of law appropriately addressed through

summary adjudication.

## IV.   DISCUSSION

### A.   Guiding Principles

Congress undoubtedly has the power to regulate the national health care

services and health insurance markets.  See United States v. S.E. Underwriters

Ass'n, 322 U.S. 533, 552-53 (1944).  At issue is the means by which Congress has

chosen to regulate and reform those markets.  Fundamentally, the Health Care Act

presents novel questions about the scope of Congress's power under the Commerce

Clause and how that power conflicts with the principles of federalism upon which

this nation was founded.  The individual mandate represents an unprecedented use

of Commerce Clause powers.  However, the unprecedented nature of the individual

mandate does not render it constitutionally suspect *ab initio*.  To the contrary, the

court, according "[d]ue respect for the decisions of a coordinate branch of

Government," begins with the presumption that the Act, passed by Congress, is

constitutional.  United States v. Morrison, 529 U.S. 598, 607 (2000); id. (stating that a

court should "invalidate a congressional enactment only upon a plain showing that

Congress has exceeded its constitutional bounds"); see also United States v. Whited,

311 F.3d 259, 266 (3d Cir. 2002); United States v. Bishop, 66 F.3d 569, 576 (3d Cir.

1995) ("[The court] . . . must give substantial deference to a Congressional

determination that it had the power to enact particular legislation."). But see Va. Office for Prot. and Advocacy v. Stewart, --- U.S. ---, 131 S. Ct. 1632, 1641 (2011) ("Lack of historical precedent can indicate a constitutional infirmity." (citing Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., --- U.S. ---, 130 S. Ct. 3138, 3159-60 (2010))); Printz v. United States, 521 U.S. 898, 905, 907-08, 918 (1997) (stating that an absence of power might reasonably be inferred from the utter lack of statutes imposing similar obligations).

The Bachmans raise a facial challenge to the individual mandate provision of the Act. Their burden is substantial. To succeed, the Bachmans must establish that "no set of circumstances exist under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987); see also Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008).[6]

### B.    Relevant Commerce Clause Jurisprudence

Article I, Section 8 of the United States Constitution delegates to Congress the power "[t]o regulate Commerce with foreign Nations, among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. The Supreme Court has

---

[6]  The court notes that in Virginia ex rel. Cuccinelli v. Sebelius, 728 F. Supp. 2d 768, 774 (E.D. Va. 2010) rev'd on other grounds, --- F.3d ---, 2011 WL 3925617 (4th Cir. 2011). Judge Hudson questioned the continuing viability of the Salerno standard and observed that "[a] careful examination of the Court's analysis in Lopez and Morrison does not suggest the standard articulated in Salerno." Id. Nonetheless, he opined: a statute that "exceeds the power of Congress to adopt adversely affects everyone in every application," thereby satisfying the Salerno standard. Id. This court recently rejected the argument that the Salerno standard is no longer viable. See Behar v. Pa. Dep't of Transp., --- F. Supp. 2d ---, 2011 WL 1195896, at *3-4 (M.D. Pa. Mar. 31, 2011).

delineated three areas to which Congress's Commerce Clause power extends: (1) Congress may regulate the channels of interstate commerce; (2) Congress may regulate and protect the instrumentalities of interstate commerce and persons or things in the stream of interstate commerce; and, (3) Congress may regulate activities that have a substantial effect on interstate commerce.  See Perez v. United States, 402 U.S. 146, 150 (1971); see also United States v. Lopez, 514 U.S. 549, 558 (1995); Whited, 311 F.3d at 265.  The first two categories prove relatively uncontroversial.  It is the third category—the category at issue in the matter *sub judice*—where the "outer limits" of Congress's Commerce Clause authority are challenged.  See Lopez, 514 U.S. at 557.

The court's task when analyzing a statute passed pursuant to Congress's Commerce Clause power is a modest one.  The court need only satisfy itself that Congress had a rational basis to conclude that the regulated activity substantially affects interstate commerce.  Gonzales v. Raich, 545 U.S. 1, 22 (2005); Bishop, 66 F.3d at 577 ("[The court's] job . . . is not to second-guess the legislative judgment of Congress that [the regulated activity] substantially affects interstate commerce, but rather to ensure that Congress had a rational basis for that conclusion."); see also United States v. Kukafka, 478 F.3d 531, 536 (3d Cir. 2007); Whited, 311 F.3d at 267.

The history and evolution of Commerce Clause jurisprudence has been well documented by the United States Supreme Court and, more recently, by federal courts considering challenges to the Act.  See Lopez, 514 U.S. at 552-59; id. at 568-74 (Kennedy, J., concurring); id. at 585-600 (Thomas, J., concurring); Florida, --- F.

10

Supp. 2d at ---, 2011 WL 285683, at *11-20; see also Florida ex rel. Atty. Gen., --- F. 3d ---, 2011 WL 3519178, at *24-35 (11th Cir. 2011).  The court will not belabor its discussion with that well-documented history and jurisprudence.[7]  Instead, the court will review the four Supreme Court Commerce Clause cases that form the heart of the parties' arguments.  The court stresses that these decisions loosely circumscribe  Congress's enumerated power under the Commerce Clause.  These cases serve only to animate, not resolve, the debate.

 In Wickard v. Filburn, 317 U.S. 111 (1942), the Supreme Court held that the Commerce Clause permitted Congress to regulate the production of wheat grown by a farmer solely for personal use and consumption on his farm.  The case stemmed from an amendment to the Agricultural Adjustment Act of 1938, which established wheat quotas and penalties for the production of wheat in excess of the allotted amount.  In 1941, Roscoe Filburn, the owner of a small farm, exceeded his wheat quota and was assessed a penalty.  He filed a constitutional challenge to the wheat quota provisions.  Id. at 113-14.  The Court rejected Filburn's argument,

---

[7] The court would be remiss if it did not acknowledge Chief Justice John Marshall's early declaration of Congress's plenary power under the Commerce Clause: "it is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 75 (1824).  Despite this seemingly broad authority, Congress did not utilize its power under the Commerce Clause to affirmatively regulate commerce among the states until 1887.  See Florida, --- F. Supp. 2d at ---, 2011 WL 285683, at *15 (citing Kidd v. Pearson, 128 U.S. 1 (1888)). Another fifty years passed before the Supreme Court held that Congress could regulate intrastate activities that substantially affect interstate commerce.  NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937).

finding that Congress's reach under the Commerce Clause power extends to local activity that has a substantial economic effect on interstate commerce. Id. at 125. The court explained that wheat grown for personal consumption "supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce." Id. at 128. That Filburn's "own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation, where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." Id. at 127-28. Congress could therefore properly conclude that regulation of home-grown wheat was essential to its regulation of the entire wheat market for the purpose of stabilizing the price of wheat. Id.

Subsequent to the Court's expansive interpretation of the Commerce Clause in Wickard, limits on Congress's Commerce Clause power appeared virtually nonexistent. Not until United States v. Lopez, 514 U.S. 549 (1995), did the Supreme Court affirm any bounds to the extensive reach of Congress's Commerce Clause power. Lopez presented the Court with a challenge to the Gun Free School Zone Act of 1990, which designated the possession of a firearm in a school zone a federal crime. Confirming that the Commerce Clause power "is subject to outer limits" the Court explained that the scope of the power

> "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between

what is national and what is local and create a completely centralized government."

Id. at 556-57 (quoting Jones & Laughlin Steel, 301 U.S. at 37).

In striking down the law as exceeding Congress's authority under the Commerce Clause, the Court explained that possession of a firearm "has nothing to do with 'commerce' or any sort of economic enterprise." Id. at 561. The statute's other failures included the absence of a jurisdiction element to ensure that it would affect interstate, and not purely intrastate, commerce and the lack of congressional findings linking handgun violence and interstate commerce. Id. at 562-63. Moreover, the Court explained that, as an isolated provision of the criminal code, the Gun Free School Zone Act was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Id. at 561. In light of the tenuous connection between interstate commerce and the possession of a gun in a school zone, the Court refused to "pile inference upon inference" to establish a link and justify the law. Id. at 567.[8]

A few years later, the Court again identified certain boundaries of Commerce Clause authority. In United States v. Morrison, 529 U.S. 598 (2000), the Court

---

[8] In 1996, Congress reenacted the Gun Free School Zone Act of 1990, adding a jurisdictional element. See Pub. L. No. 104-208 § 657, 110 Stat. 3009-369, 3009-372 (1996) (codified at 18 U.S.C § 922(q)). The later enactment has weathered Commerce Clause challenge. See, e.g., United States v. Dorsey, 418 F.3d 1038, 1045-46 (9th Cir. 2005); United States v. Danks, 221 F.3d 1037 (8th Cir. 1999) (per curiam), cert. denied, 528 U.S. 1091 (2000).

invalidated a portion of the 1994 Violence Against Women Act as exceeding the

scope of Congress's Commerce Clause power.  The invalidated provision of the Act

created a federal civil cause of action for victims of gender-motivated violence.  The

Court emphasized that "thus far in our Nation's history our cases have upheld

Commerce Clause regulation of intrastate activity only where that activity is

economic in nature."  Id. at 613; see also id. at 611 (stating that Commerce Clause

case law demonstrates that in all cases where the court sustained federal regulation

of intrastate activity on basis of the activity's substantial effect on interstate

commerce, the regulated activity "has been some sort of economic endeavor").  The

Court highlighted in its analysis the fact that "[g]ender-motivated crimes of violence

are not, in any sense of the phrase, economic activity."  See id. at 613.  Also

pertinent, and similar to the statute in Lopez, the provision lacked a jurisdictional

element.  Id.  However, unlike the Gun Free School Zone Act of 1990, Congress

made numerous findings linking gender-motivated crimes of violence to interstate

commerce.  The Court considered the congressional findings relevant but not

dispositive.  Id. at 614 ("[T]he existence of congressional findings is not sufficient, by

itself, to sustain the constitutionality of Commerce Clause legislation.").  Ultimately,

the Court concluded that the link between gender-motivated crimes of violence and

interstate commerce was simply too attenuated.  Id. at 615-16 (rejecting "cost of

crime" and "national productivity" arguments).  Congress cannot, under the

auspices of its Commerce Clause authority, "regulate noneconomic, violent criminal

conduct based solely on that conduct's aggregate effect on interstate commerce." Id. at 617.

Most recently, in Gonzales v. Raich, 545 U.S. 1 (2005), the Supreme Court upheld Congress's authority under the Commerce Clause to prohibit the possession of home-grown marijuana intended solely for personal use.  Noting the numerous congressional findings linking the market for controlled substances with interstate commerce, see id. at 13 n.20, the Court concluded that the Controlled Substance Act regulates "quintessentially economic" activity—the production, distribution and consumption of commodities.  Id. at 25-26.  The Court recognized that Commerce Clause jurisprudence "firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce."  Id. at 17 (citing Perez, 402 U.S. at 151; Wickard, 317 U.S. at 128-29); see also id. at 18 ("Congress can regulate purely intrastate activity that is not itself 'commercial' . . . if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity.").

Noting striking similarities to Wickard, the Court concluded that the regulation was "squarely within Congress' commerce power."  Congress had a rational basis to conclude that the production of marijuana for home consumption, just as the production of wheat for home consumption, substantially affects supply and demand in the national market.  Id. at 19, 22.  Unlike Lopez and Morrison, in which the parties claimed the challenged statutes fell outside Congress's authority

in their entirety, the respondents in <u>Raich</u> sought the excision of individual applications of an admittedly valid statute.  <u>Id.</u> at 23.  The Court deemed the distinction "pivotal" given the Court's longstanding refusal to excise trivial individual instances of a properly regulated class of activities.  <u>Id.</u>; <u>see</u> <u>also</u> <u>id.</u> at 17 ("When Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class," and "the *de minimis* character of individual instances arising under that statute is of no consequence." (internal citations and quotations omitted)).  Moreover, regulation of the intrastate manufacture and possession marijuana was but one of many parts of a larger regulatory scheme that would be undercut unless the intrastate activity were regulated.  <u>Id.</u> at 22, 24-25.

### C.    <u>Summary of Parties' Respective Arguments</u>

The government directs the court to <u>Wickard</u> and <u>Raich</u> and asserts that Congress can regulate economic decisions, such as the decision to carry (or not carry) health insurance, when those decisions, taken in the aggregate, substantially affect interstate commerce.  (Doc. 13, at 28; Doc. 30, at 21; Doc. 44, at 17, 21).  The government asserts that the decision to purchase health insurance or to "self-insure" is, in actuality, a decision on how to finance future health care costs—a quintessentially economic decision that substantially affects interstate commerce. (Doc. 13, at 34; Doc. 44, at 20; <u>see</u> <u>also</u> Tr. at 46-47).  The government also asserts that the market for health care services is unique: "individuals cannot make a personal choice to eliminate the current or potential future consumption of the

commercial product at issue, health care services." (Doc. 30, at 26). Thus, the government contends that the Bachmans cannot "opt out" of the market, that is, they are currently active participants in the health care services market. (Doc. 13, at 38). "Individuals who forego health insurance coverage do not thereby forego health care." (Doc. 13, at 35). This reality presents itself against a backdrop of federal law guaranteeing a minimum level of health care regardless of an individual's ability to pay. (Doc. 13, at 35; Doc. 30, at 22; Tr. at 50-51); see also Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd.

The Bachmans argue that Congress's enactment of the individual mandate is an attempted exercise of police power inconsistent with the Framers' design of dual sovereigns. They direct the court to Morrison and Lopez and assert that Congress's Commerce Clause power "is the power to regulate, that is, to prescribe the rule by which commerce is to be governed." Lopez, 514 U.S. at 552-53. They argue that the commerce power is cabined by the predicate of commercial conduct that has a substantial impact on interstate commerce. The Bachmans assert that the "Commerce Clause does not comprehend the power to command individuals to engage in commerce in the first instance." (Doc. 57, at 3). The individual mandate, they argue, is a command to enter commerce, i.e. compelled market participation in the form of a lifetime commitment to minimum health insurance coverage. The Bachmans acknowledge that their decision not to purchase health insurance is a choice with an economic dimension. They argue, however, that a mere financial choice, without more, is not commerce subject to congressional control under the

17

auspices of the Commerce Clause.  In support of this argument they rely on the observation of Justice Kennedy in <u>Lopez</u>:   "In a sense, any conduct in our interdependent world of ours has an ultimate commercial original or consequence, but we have not yet said the commerce power may reach so far . . . ."  <u>Lopez</u>, 514 U.S at 563.

Given the unique factual circumstances of this case, both the Bachmans and the government can effectively distinguish Commerce Clause jurisprudence that appears unsupportive of their respective positions.  Therefore, the Supreme Court decisions in <u>Wickard</u>, <u>Lopez</u>, <u>Morrison</u>, and <u>Raich</u> provide only limited guidance for the court's analysis.  Quite simply, this is a case of first impression.  Of much greater utility to the court is the developing case law directly addressing the individual mandate.

### D.  **Current Split of Authority**

The court is well aware of the district court cases and most recent circuit court decisions in the Fourth, Sixth and Eleventh Circuits on the constitutionality of the individual mandate.  Application of this developing case law is problematic in light of the split of authority.  The court finds it unnecessary to engage in a lengthy discussion of all cases addressing the individual mandate.  However, a review of both the Sixth and Eleventh Circuit opinions—each opinion endorsing a different

18

side of the argument and effectively representing the parties' respective positions in their most comprehensive form to date—is illuminating.[9]

### 1.    Sixth Circuit Decision

On June 29, 2011, the United States Court of Appeals for the Sixth Circuit issued its opinion in Thomas More Law Center v. Obama, --- F.3d ---, 2011 WL 2556039 (6th Cir. 2011).  The Sixth Circuit affirmed the lower court's ruling, holding that the individual mandate withstood facial constitutional challenge under the Commerce Clause.  The opinion was not unanimous.  Indeed, each member of the three-judge panel issued a separate opinion.  Judge Martin, writing for the majority, held the individual mandate to be a valid exercise of Congress's Commerce Clause authority.  Id. at *8-18.  Judge Sutton, concurring in the judgment, more narrowly concluded that the individual mandate withstood facial challenge under the standard set forth in United States v. Salerno, 481 U.S. 739, but did not rule out the possibility of a successful as-applied challenge.[10]  Id. at *21-33.  Judge Graham,

---

[9] On September 8, 2011 the Fourth Circuit issued its opinions in Virginia ex rel. Cuccinelli v. Sebelius, --- F.3d ---, 2011 WL 3925617 (4th Cir. 2011), and Liberty University, Inc. v. Geithner, --- F.3d ---, 2011 WL 3962915 (4th Cir. 2011).  Only the Liberty University opinion is relevant to the challenge before this court.  In Liberty University, Inc., the court concluded that it lacked standing to address individual challenges to the minimum coverage provision after finding that the individual mandate constituted a tax within the meaning of the Anti-Injunction Act, therefore barring pre-enforcement action.  Liberty Univ., Inc., --- F.3d ---, 2011 WL 3962915.  I am not persuaded by the analysis set forth in Liberty University, Inc. and reaffirm my conclusion on the non-applicability of the Anti-Injunction Act, as set forth in the prior opinion.  See Goudy-Bachman, 764 F. Supp. 2d at 694-97.

[10] As this is the more narrow holding, it is controlling for purposes of review by the United States Supreme Court.  Plaintiffs filed a petition for writ of certiorari

sitting by designation, dissented with respect to the Commerce Clause analysis,

concluding that within the relevant market—the market for health insurance, not

the larger market for health care services—the minimum coverage provision

extends beyond Congress's Commerce Clause reach by regulating the status of

being uninsured.  Id. at *34-40.

Writing for the majority, Judge Martin explained that the individual mandate

regulates the activity of self-insuring against the cost of health care services, id. at

*10, which "is decidedly economic."  Id. at *11 ("The activity of foregoing health

insurance and attempting to cover the cost of health care needs by self-insuring is

no less economic than the activity of purchasing an insurance plan.").  The court

rejected any constitutional distinction between activity and inactivity, but

nonetheless found that the individual mandate regulates active participation in the

market for health care services.  Id. at *14-15 ("[T]he constitutionality of the

minimum coverage provision cannot be resolved with a myopic focus on a

malleable label.").  Judge Martin reasoned that virtually every U.S. resident is

active in the health care services market due to: (1) the near universal need for

health care services and (2) the receipt of services regardless of ability to pay.  Id. at

---

with the Court on July 26, 2011.  Thomas More Law Ctr. v. Obama, No. 11-117 (July
26, 2011).  Given Commerce Clause jurisprudence, I question whether an as-applied
challenge could ever be successful.  The Supreme Court has squarely held that
Congress may aggregate the class of activities having a substantial effect on
interstate commerce, and the Court will not excise trivial individual instances from
the class.  See Raich, 545 U.S. at 23-28 (rejecting as-applied challenge to Controlled
Substance Act where plaintiffs sought to excise their individual conduct from an
admittedly valid statute); Wickard, 317 U.S. at 127-28.

*15.  Equating the activity to the home-grown wheat in <u>Wickard</u>, Judge Martin reasoned that "self-insuring individuals are attempting to fulfill their own demand for a commodity rather than resort to the market and are thereby thwarting Congress's efforts to stabilize prices." <u>Id.</u> at *12.  Hence, Congress could rationally conclude that this economic activity of self-insuring, in the aggregate, substantially affects interstate commerce by increasing the costs of health care and shifting costs onto third parties.  <u>Id.</u>  Judge Martin also validated the individual mandate for a second reason: he concluded that the provision is an essential part of a broader economic regulatory scheme that would be undercut without regulating those who self-insure.  <u>Id.</u> at *12-14.

Concurring in the judgment, Judge Sutton concluded that the plaintiffs could not establish that the individual mandate was unconstitutional in all its applications.  <u>Id.</u> at *21-33 (Sutton, J., concurring); <u>Salerno</u>, 481 U.S. at 745 (stating that a law is facially unconstitutional only if "no set of circumstances exists under which the Act would be valid").  Emphasizing the breadth of the substantial effects doctrine Sutton concluded that whether the activity is characterized as obtaining, paying, or insuring for health care, all substantially affect interstate commerce.  <u>Id.</u> at *24.  He rejected any temporal distinction between the Act's individual mandate and a mandate tethered to the actual provision of services, citing <u>Raich</u> and <u>Wickard</u> as cases where the plaintiffs had not entered any market, yet Congress regulated them all the same.  <u>Id.</u> at *30.  In Judge Sutton's view, "[r]equiring insurance today and requiring it at a future point of sale amount to policy

21

differences in degree, not kind." Id.  Resting on the uniqueness of the market for health care services, he rejected the claim that to allow Congress to mandate the purchase of health insurance is to grant Congress unlimited authority under the Commerce Clause.  Id. at *32 (stating that the market has few, if any, parallels).  As stated, his conclusion is confined by the standard of review: assuming *arguendo* that the individual mandate is unconstitutional as applied to some individuals, plaintiffs cannot establish that the provision is facially invalid and unconstitutional in all applications.  Id. at *31, 33.

Judge Graham, in dissent, defined the relevant market for purposes of Commerce Clause analysis as the market for health insurance and concluded that the uninsured's absence from that market is not economic activity.  Id. at *37. From Judge Graham's perspective, Congress is regulating the decision not to enter the market for insurance.  Unlike the plaintiffs in Wickard and Raich, "[p]laintiffs have not bought or sold a good or service, nor have they manufactured, distributed, or consumed a commodity."  Id.  Judge Graham acknowledged that decisions not to purchase insurance are choices about risk and finances that, when aggregated, have economic consequences, but ultimately he found the cost-shifting caused by such decisions to be similar to the "cost of crime" and "national productivity" reasoning rejected in Lopez and Morrison.  Id. at *38.  This cost-shifting rationale, he concluded, "has no logical end point."  Id.  Thus, he concluded that to approve this exercise of power to force individuals into a market is to declare no limits on the extent of Congress's Commerce Clause power.  Id. at *41.

2.   **Eleventh Circuit Decision**

On August 12, 2011, the Eleventh Circuit weighed in with its majority opinion

on the individual mandate in <u>Florida ex rel. Attorney General v. United States</u>

<u>Department of Health and Human Services</u>, --- F.3d ---, 2011 WL 3519178 (11th Cir.

2011).  The majority interpreted Supreme Court Commerce Clause jurisprudence as

placing two broad limits on Congress's Commerce Clause authority: (1) the

preservation of the federalist structure; and (2) the denial of a general police power

to the federal government.  <u>Id.</u> at *40-41.  With these limits informing its analysis,

the majority concluded that Congress exceeded its authority in passing the

individual mandate.

The <u>Florida</u> court opined that the distinction between activity and

inactivity—a distinction raised by plaintiffs across the nation challenging the

mandate—is "useful only to a point."  <u>Id.</u> at *42.  On one hand, all Supreme Court

cases "share at least one commonality: they all involved attempts by Congress to

regulate preexisting, freely chosen classes of activity."  <u>Id.</u>  On the other hand, the

Supreme Court has never expressly held that activity is a precondition for

regulation.  Instead, the Supreme Court describes commerce in general terms due

to the impracticality of formulating precise, all-encompassing definitions.  <u>Id.</u> at

*42-43.  Simply put, the value of such nomenclature and labeling in Commerce

Clause analysis is suspect.  <u>Id.</u> at *44 n.86 ("Whether one describes the regulated

individual's decision as the financing of health care, self-insurance, or risk

retention, the congressional mandate is to acquire and continuously maintain health coverage.").

Of particular import to the Eleventh Circuit, was the unprecedented nature of the individual mandate in the nation's history.  The Commerce Clause, the Florida majority noted, has never been interpreted to allow Congress to dictate the financial decisions of every American.  Id. at *45.  Legislative enactments have sought to encourage favorable commercial activity, not require it.  Id. at *46.  In the court's view, the lack of historical precedent for the use of the Commerce Clause to force commercial activity is quite telling, for

> [f]ew powers, if any, could be more attractive to Congress than compelling the purchase of certain products.  Yet even if we focus on the modern era, when congressional power under the Commerce Clause has been at its height, Congress still has not asserted this authority.  Even in the face of a Great Depression, a World War, a Cold War, recessions, oil shocks, inflation and unemployment, Congress never sought to require the purchase of wheat or war bonds, force a higher savings rate or greater consumption of American goods, or require every American to purchase a more fuel efficient vehicle.

Id. at *46.  Americans, the court noted, have only been subjected to a limited number of personal mandates with clear constitutional foundations, such as serving on juries, registering for the draft, and filing income tax returns.  Id. at *47.

In addition to its unprecedented nature, the Eleventh Circuit found the scope of the individual mandate to be "woefully overinclusive," id. at *50, and the nexus between the regulated activity and interstate commerce to be wanting.  Id. at *49.  The mandate is not tied to those who do not pay for health care or even those individuals who consume health care, "[r]ather, the language of the mandate is

unlimited, and covers even those who do not enter the health care market at all."
Id. The court recognized that the Supreme Court has never addressed the
temporal aspect raised by the mandate, but credited the absence of case precedent
to the fact that all prior Commerce Clause cases have addressed existing activity,
not the mere possibility of future activity.  Id.  Thus, in the Eleventh Circuit's view,
the government's argument that most people will eventually require health care,
only reveals the extent of the individual mandate's departure from traditional
exercises of Commerce Clause power.  Id.

Moreover, the court found that the purported uniqueness of the health care
market could not save the individual mandate from its constitutional infirmities.
Flatly rejecting the government's uniqueness argument as a limiting principle, the
court pointed out that uniqueness is not a restriction found in the Constitution, and
therefore the uniqueness argument "lack[s] *constitutional* relevance."  Id. at *51
(emphasis is original).  The court noted that to the extent the health care market
has unique features, those features are not limiting principles; they are limiting
circumstances.  Id.  Furthermore, as a test or standard, uniqueness lacks
workability because it is a necessarily fact-based consideration.  Id. at *52.  The
court concluded that "[u]ltimately, the government's struggle to articulate
cognizable, judicially administrable limiting principles only reiterates the
conclusion we reach today: there are none."  Id. at *54.

The Eleventh Circuit explicitly acknowledged the depth of Congressional
findings supporting the individual mandate, recognizing the rational basis standard

of review for assertions of Commerce Clause authority.  The court explained, however,  that whether there is a rational basis to believe that an activity in the aggregate has a substantial effect on interstate commerce is distinct from the questions of (1) whether the regulated activity is amenable to aggregation in the first place, and (2) the extent of the inferential leap to connect the regulated activity and its effects on interstate commerce.  Id. at *55 & n.116.  Reasoning that the cost-shifting rationale behind the individual mandate is similar to the cost-shifting theories rejected by the Supreme Court in both Lopez and Morrison, id. at *56-57, the court concluded that the inferential leaps were simply too disconnected, and the regulated activity too "remote" to uphold the individual mandate.  Id. at *57.

Particularly important to the court's decision were federalism concerns, one of the perceived limits on Commerce Clause authority.  Upon review of the history and jurisprudence of the regulation of the health care and health insurance industries, the court determined that both industries fall within the sphere of traditional state regulation.  Id. at *58-61.  Though both the state and federal government have regulated heavily in these fields, the court concluded the individual mandate provision encroaches too far in an area of traditional state concern.  Id.

Finally, the Eleventh Circuit rejected the government's assertion that the individual mandate is essential to a larger regulatory scheme.  Calling it a "doctrine of recent vintage," id. at * 62, stemming from the Necessary and Proper Clause, id. at 64, the court stated that the mere placement of the individual mandate in a

broader regulatory scheme does not render the regulation essential to that scheme.

Id. at *64.  Instead, the court found that the conduct regulated by the individual

mandate—not purchasing insurance—neither burdens nor obstructs Congress's

ability to enforce its newly-passed regulations of the insurance industry.  Id. at *65.

> At best, the individual mandate is designed *not* to enable the execution
> of the Act's regulations, but to counteract the significant regulatory
> costs on insurance companies and adverse consequences stemming
> from the fully executed reforms.  That may be a relevant political
> consideration, but it does not convert an unconstitutional regulation
> (of an individual's decision to forego purchasing an expensive product)
> into a constitutional means to ameliorate adverse cost consequences
> on private insurance companies engendered by Congress's broader
> regulatory reform of their health insurance products.

Id.  The court therefore concluded that "to the extent the uninsureds' ability to

delay insurance purchases would leave a 'gaping hole' in Congress's effort to reform

the insurance market, Congress has seen fit to bore the hole itself."  Id.

In sum, after a review of Commerce Clause jurisprudence, the

unprecedented nature of the individual mandate, its broad scope and the

congressional findings supporting it, the court concluded that the individual

mandate embodied no limits, and exceeded Congress's Commerce Clause powers.

Id. at *66.  For the Eleventh Circuit, "[t]he federal government's assertion of power,

under the Commerce Clause, to issue an economic mandate for Americans to

purchase insurance from a private company for the entire duration of their lives is

unprecedented, lacks cognizable limits, and imperils our federalist structure."  Id.

at *68.  The court therefore affirmed the district court in striking down the

individual mandate as unconstitutional.

### 3.   <u>Unchartered Territory</u>

The Sixth Circuit and Eleventh Circuit decisions concur on one significant

point: the Health Care Act has no equivalent in Commerce Clause jurisprudence.

Quite simply, there is no factually similar precedent addressing the use of

Congress's commerce power to enact an economic mandate of this magnitude.

> The Court, for one, has never considered the validity of this type of
> mandate before, at least under the commerce power. . . .  Not only has
> the Court never crossed this line, neither has Congress . . . .

See <u>Thomas More Law Ctr.</u>, --- F.3d at ---, 2011 WL 2556039, at *25-26 (Sutton, J.,

concurring).

> Both parties have cited extensively to previous Supreme Court
> opinions defining the scope of the Commerce Clause.  Economic
> mandates such as the one contained in the Act are so unprecedented,
> however, that the government has been unable . . . to point this Court
> to Supreme Court precedent that addresses their constitutionality. . . .
> What the Court has never done is interpret the Commerce Clause to
> allow Congress to dictate the financial decision of Americans through
> an economic mandate.

See <u>Florida</u>, --- F.3d at ---, 2011 WL 3519178, at *45.

Thus, both decisions spotlight the individual mandate's voyage into

unchartered territory of constitutional law.  Whether the extension of power is

logical or appropriate, the fact of the matter is that Commerce Clause jurisprudence

is bereft of authority clearly permitting the extension.

### E.    <u>Oral Argument</u>

On July 21, 2011, counsel for the parties graciously tolerated a two hour inquiry by the court into the nuances of their respective positions.  The court commends counsel for their professionalism and candor during oral argument.

One particular exchange between the court and counsel for the government bears mention as it underscores the government's expansive view of its Commerce Clause power.  To test the limits of Congress's Commerce Clause authority, the court asked government counsel to assume that the "graying of America" and aging Baby Boomer population results in a dire shortage of affordable nursing home care. The court posed the following question: "[A]s a result, could Congress mandate the purchase of long-term care insurance?" (Tr. at 51).

In response, the government conceded that Congress could: (1) determine that a market is faltering due to the failure of individuals to pay for the goods or services they receive in that market, and then (2) invoke its Commerce Clause power to require the individuals to pay for the goods or services in advance of seeking or obtaining them.  Thus, supported with appropriate findings, counsel for the government posited that Congress could require the purchase of long term care insurance as a condition of lawful residency:

> [I]t is possible that Congress at some point would determine that this is a crisis and that people have to pay for it, and there are various ways that they could do that.

(Tr. at 53).[11]

Although this exchange reflects the government's conception of an extremely broad commerce power, the government's response is merely a logical extension of its view of Section 5000A, i.e. an intellectually honest assessment of potential future mandates. In this respect, I part company with the <u>Florida</u> district court, --- F. Supp. 2d at ---, 2011 WL 285683, at *24-25, and the majority in the <u>Florida</u> circuit court, --- F.3d at  ---, 2011 WL 3519178, at *50-54, that, if affirmed, an expanded commerce power would open a Pandora's box of nefarious mandates limited only by the confines of a legislative majority.

The consequences of an expanded commerce power are not so dire.  First, the notion that Congress could compel the consumption of broccoli, <u>see</u> <u>Florida</u>, --- F. Supp. 2d at ---,  2011 WL 285683, at *24 ("Congress could require that people buy and consume broccoli at regular intervals . . . ."), or apples, for that matter, is simply incorrect.  <u>See</u>, <u>e.g.</u>, <u>Planned Parenthood of S.E. Pa. v. Casey</u>, 505 U.S. 833, 849 (1992) ("[T]he Constitution places limits on a State's right to interfere with a person's most basic decisions about family and parenthood, as well as bodily integrity." (internal citations omitted)); <u>Cruzan v. Mo. Dep't of Health</u>, 497 U.S. 261,

---

[11]  The court initially tested the government's understanding of the limits on Commerce Clause authority by referencing the well-known proverb "an apple a day keeps the doctor away," and inquiring whether Congress could force U.S. citizens to purchase apples if the proverb was supported by congressional findings and deemed a partial solution to the health care crisis.  (Tr. at 49).  Although noting that the question poses "a very distinct situation" from that presented by individual mandate, the government did not and could not say that the mandated purchase of a commodity was outside the realm of Commerce Clause authority.  (<u>Id.</u>)

278 (1990) (individuals possess constitutionally protected liberty interest in refusing unwanted medical treatment); Washington v. Harper, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."). To be sure, it is the government's view that the Commerce Clause power subsumes the power to compel a *purchase* or a *transaction*, not *consumption*. (Tr. at 49-54). Second, as the dissent in Florida astutely observes, Congress is restricted by constitutional text and Supreme Court jurisprudence to the regulation of economic behavior that has a substantial affect on interstate commerce. Florida, --- F.3d at ---, 2011 WL 3519178, at *105 (Marcus, J., dissenting); see also id. at *99-102. These are, indeed, "powerful limits" upon the exercise of Congress's Commerce Clause power. Third, the truly unique factual circumstances of this case would necessarily render any holding limited. Id. at *109; id. at * 112 ("Upholding the mandate under the particular circumstances of this case would do little to pave the way for future congressional mandates that address wholly distinct problems that may arise in powerfully different contexts."). Finally, an informed electorate would not countenance frivolous mandates. See Daughters of Miriam Ctr. for the Aged v. Mathews, 590 F.2d 1250, 1257 (3d Cir. 1978) (stating that "for protection against abuses by legislatures the people must resort to the polls" (internal citations and quotations omitted)); see also United States v. Butler, 297 U.S. 1, 79 (1936) (Stone, J., dissenting) ("For the removal of unwise laws from the statute books appeal lies, not to the courts, but to the ballot and to the processes of democratic government.").

Unfortunately, ominous predictions of the commerce power run amok serve only to obfuscate the proper analysis. As set forth below, this Court's *ratio decidendi* is straightforward: Heretofore, the Supreme Court has never sanctioned, under the auspices of the Commerce Clause, the enactment of a broad scale economic mandate in anticipation of a probable but uncertain future transaction. The Supreme Court's Commerce Clause jurisprudence does not lend itself to such an expansive interpretation. Until the Supreme Court interprets the commerce power to permit these anticipatory mandates, I am bound by *stare decisis* to conclude that Section 5000A is unconstitutional.

### F.    Analysis

This court rejects any distinction between activity and inactivity for purposes of Commerce Clause analysis. Such wordplay is imprecise and unhelpful to the court's analysis and ultimate conclusion. See Thomas More Law Ctr., --- F.3d at ---, 2011 WL 2556039, at *14-15; id. at *27 (Sutton, J., concurring) (rejecting activity/inactivity dichotomy and stating that "[l]evel of generality is destiny in interpretive disputes"); id. at *36 (Graham, J., dissenting in part). The Supreme Court, on at least two occasions, has adopted linguistic distinctions in the context of the Commerce Clause only to later abandon them. See Wickard, 317 U.S. at 120 ("[Q]uestions of the power of Congress [under the Commerce Clause] are not to be decided by reference to any formula which would give controlling force to nomenclature such as 'production' and 'indirect' and foreclose consideration of the actual effects of the activity in question upon interstate commerce."); see also Jones

32

& Laughlin Steel Corp., 301 U.S. at 36-38.  Leaving aside such malleable labels, like

the <u>Florida</u> court, <u>see</u> <u>Florida</u>, --- F.3d at ---, 2011 WL 3519178, this court finds that

the extension of Commerce Clause power to the pre-transaction stage would

eliminate "judicially enforceable boundaries."  <u>Morrison</u>, 529 U.S. at 608 n.3, <u>Lopez</u>,

514 U.S. at 566.

## 1.    **Anticipatory Mandate**

Section 1501 of the Act, Pub. L. No. 111-148 § 1501, 124 Stat. 119, is a

mandate in anticipation.  It regulates many individuals who have not yet entered

the market—whether one defines the market as the broader market for health care

services or the market for health insurance—in anticipation of their entrance into

the health care services market.[12]  <u>See</u> <u>Thomas More Law Ctr.</u>, --- F.3d at ---, 2011

WL 2556039, at * 36 (Graham, J., dissenting in part) ("The requirement that all

citizens obtain health insurance does not depend on them receiving health care

services in the first place.  Individuals must carry insurance each and every month

regardless of whether they have actually entered the market for health services.").

To date, all exercises of Commerce Clause authority have proscribed or prescribed

activity by individuals *already engaged* in commerce who are active in the relevant

---

[12]  The majority opinion in <u>Thomas More Law Center</u>, --- F.3d ---, 2011 WL
2556039, defines the relevant market as the market for health care delivery, <u>id.</u> at
*10, whereas the dissent considers the relevant market to be the more narrow
market for health insurance. <u>Id.</u> at *35-36.  The outcome is the same regardless of
whether one considers the relevant market to be the health care services market or
health insurance market because the minimum coverage provision seeks to
regulate conduct prior to an uninsured's entrance into either market.  The
Commerce Clause simply does not reach this pre-transaction stage.

interstate market.  <u>See</u>, <u>e.g.</u>, 42 U.S.C. § 2000a (prohibiting discrimination or

segregation by places of public accommodation (upheld against commerce clause

challenge in Heart of Atlanta Motel v. United States, 379 U.S. 241 (1964) and

Katzenbach v. McClung, 379 U.S. 294 (1964))); 42 U.S.C. § 4012(a) (prohibiting

federally regulated lending institutions from making, increasing, extending or

renewing loans secured by improved property located in flood hazzard zones unless

the property securing the loan is covered by flood insurance); 18 U.S.C. § 922(g)

(prohibiting possession firearm affecting commerce or receive firearm shipped or

transported in interstate commere); 42 U.S.C. § 16913 (requiring sex offenders to

register under Sex Offender Registration and Notification Act before and after

traveling in interstate commerce (upheld under Commerce Clause challenge in

<u>United States v. Shenandoah</u>, 595 F.3d 151, 160 (3d Cir. 2010); <u>United States v. May</u>,

535 F.3d 912, 921-22 (8th Cir. 2008); <u>United States v. Hinckley</u>, 550 F.3d 926, 939-40

(10th Cir. 2008); <u>United States v. Ambert</u>, 561 F.3d 1202, 1210-12 (11th Cir. 2009)));

<u>Gibbons</u>, 22 U.S. 1 (holding that Congress has the authority under the Commerce

Clause to regulate steamboat traffic); <u>The Lottery Case</u>, 188 U.S. 321 (1903)

(authority to regulate the trafficking of lottery tickets across state lines); <u>Jones &</u>

<u>Laughlin Steel Corp.</u>, 301 U.S. 1 (authority to regulate labor practices); <u>South-</u>

<u>Eastern Underwriters</u>, 322 U.S. 533 (authority to regulate the terms of insurance

contracts).

     The government's invocation of the Third Circuit's decision upholding the

Dead Beat Parents Act against Commerce Clause challenge is of no moment.  <u>See</u>

Kukafka, 478 F.3d 531.  The government asserts that the conduct regulated in

United States v. Kukafka—failing to pay interstate child support obligations—is

similar to the Bachman's decision to not purchase health insurance.  The analogy is

inapposite.  First, the Dead Beat Parent Act regulates the failure to pay *after* the

failure to pay occurs, not before.  Second, parents who fail to pay child support

obligations have been legally adjudged to owe child support to the caretaker of their

offspring, and thus carry with them an ongoing and affirmative obligation to pay

that support when they or the child move across state lines.  See 18 U.S.C. § 228.

This affirmative obligation, with clear interstate implications, distinguishes the

Dead Beat Parents Act from the minimum coverage provision.  The Bachmans are

not presently in the health insurance market, nor do they have any legally owed

debts for health care services or insurance already received.   The government

compares post-conduct regulation of a failure to pay with pre-conduct regulation of

a *possibility* that the Bachmans will seek medical services and then fail to pay their

medical expenses.  The Bachmans do not contest that they can be regulated once

they receive services and fail to pay for those services.  It is the pre-conduct

requirement to pay in advance that is at issue.  Regulation under the Dead Beat

Parents Act does not equate to the exercise of Commerce Clause power over an

individual's failure to enter a market.

Wickard and Raich, the Supreme Court's most expansive interpretations of

the Commerce Clause, do not extend Commerce Clause jurisprudence to the realm

Congress seeks to regulate with the minimum coverage provision.  Judge Sutton's

35

conclusion in <u>Thomas More Law Center</u>, that the plaintiffs in <u>Wickard</u> and <u>Raich</u> were regulated prior to their entry in the relevant markets, ignores the affirmative conduct of those plaintiffs in obtaining or producing commodities with an interstate market.  Importantly, the respondents in <u>Raich</u> could stop cultivating and possessing marijuana and thus places themselves beyond the scope of the Controlled Substance Act.  Roscoe Filburn, the farmer in <u>Wickard</u>, could avoid penalty by simply choosing to grow less wheat, or none at all.  Congress can reach the personal production of wheat—a clear activity affecting the interstate market—in an effort to stabilize the wheat market.  Congress cannot, however, in order to stabilize that market, force the purchase of wheat by individuals who decide to forego wheat or wheat products, even if Congress legitimately determines that an individual's decision to not purchase wheat or wheat products inhibits the government's ability to regulate or stabilize the wheat market.  Similarly, Congress may lawfully regulate the interstate market for health insurance and health services, but Congress cannot require individuals who choose not to purchase health insurance or individuals who are not currently seeking or receiving services in the health care market to purchase health insurance in order to stabilize the health insurance market.  Congress cannot mandate or regulate in anticipation of conduct that may or may not occur in the future.

The Supreme Court's holdings in <u>Lopez</u> and <u>Morrison</u> make vividly clear that Commerce power is "not without effective bounds."  <u>Morrison</u>, 529 U.S. at 608 (citing <u>Lopez</u>, 514 U.S. at 557).  Those opinions caution that "the scope of the

interstate commerce power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." Id. (quoting Lopez, 514 U.S. at 556-57 and Jones & Laughlin Steel, 301 U.S. at 37) (internal citations and quotations omitted).  Similar to the "piling of inferences" necessary to connect the regulated activity in Lopez and Morrison to interstate commerce, the nexus between not purchasing insurance and interstate commerce is wanting.  See Florida, --- F.3d at ---, 2011 WL 3519178, at *49.

Before an uninsured, or self-insured individual's conduct has any effect on commerce, the individual must first obtain health care services.  Indeed, the actual conduct targeted by Congress requires yet a further step—nonpayment of services.  See Thomas More Law Ctr., --- F.3d at ---, 2011 WL 2556039, at *38 (Graham, J., dissenting) (noting that the minimum coverage provision is not conditioned on either the consumption of health care services or the nonpayment for those services).  Unless and until that point, an individual's status as uninsured or "self insured"—whichever nomenclature one chooses to apply—has no effect whatsoever

on interstate commerce.[13]  Concisely stated, "the mere status of being without health insurance, in and of itself, has absolutely no impact whatsoever on interstate commerce (not 'slight,' 'trivial,' or 'indirect,' but *no impact whatsoever*)-at least not any more so than the status of being without any particular good or service." Florida, --- F. Supp. 2d at ---, 2011 WL 285683, at *26.  The minimum coverage provision regulates now for a future contingent event.  It is a mandate in anticipation of the receipt of health care services that forces individuals to become market participants prior to entering the market or engaging in any conduct, activity or transaction in that market.

### 2.   Market Timing and Limits on Commerce Clause Authority

The government contends that the timing of the minimum coverage provision—the purchase of insurance prior to engaging in the health care market through the receipt of health care services—is inconsequential in the context of this case.  The government contends that the uniqueness of the market and the nature of insurance, which necessarily entails payment for services in advance of receipt of services, justifies Congress's use of Commerce Clause authority to regulate individuals prior to their entry into the market.  The Bachmans reject uniqueness as a limiting principle, arguing that all markets are unique in some respect and to

---

[13]  The court finds the uninsured/self-insured nomenclature to be as unhelpful as the activity/inactivity distinction the plaintiffs originally attempted to draw.  See Thomas More Law Ctr., — F.3d at —, 2011 WL 2556039, at *10 n.3 (using the term "self-insured," but recognizing, albeit in a footnote, that such terminology is a misnomer).

extend the Commerce Clause in this manner would effectively eviscerate any limits to the power.

It is clear to the court that the health care services market is unique.  In other markets, including other insurance markets, when an individual suffers a loss or is in need of a commodity or service (such as food, transportation, or housing) there is no obligation that society compensate for that loss or provide the commodity or service without advance payment.  In the health care services market, however, against the backdrop of state[14] and federal laws such as Emergency Medical Treatment and Active Labor Act, Pub. L. No. 99-272, Title IX, § 9121(b), 100 Stat. 164 (codified as amended at 42 U.S.C. § 1395dd),  individuals can and do receive medical treatment regardless of their ability to pay.

Uniqueness as a limiting principle presents the court with a wholly novel question in Commerce Clause jurisprudence.  The text of the Constitution itself does not admit such a limiting principle.  Moreover, the court has been unable to find any precedent, and the parties have been unable to direct the court to any precedent, that permits the expansion of the Commerce Clause authority to regulate individuals prior to their engagement in commercial activity on the basis of the unique nature of the market being regulated.  This court is bound by the principles of *stare decisis* and must reasonably interpret, *not create*, law.  See

---

[14]  For example, in Pennsylvania, "as a continuing condition of licensure, each provider should offer and provide medically necessary, lifesaving and emergency health care services to every person in this Commonwealth, regardless of financial status or ability to pay." 35 PA. CONS. STAT. § 449.9(a).

Burdens v. J.E. Brenneman Co., 46 F.3d 292, 305-06 (3d Cir. 1995) (stating that the court's "task is to interpret, and not to create law"); see also County of Allegheny v. Am. Civil Liberties Union of Greater Pittsburgh Chapter, 492 U.S. 573, 668 (1989) (Kennedy, J., dissenting) (stating that courts are bound to adhere to both the results of prior cases and "to their *explications* of the governing rules of law" (emphasis added)). This court's interpretation of existing precedent, including Lopez and Morrison, leads the court to the conclusion that the Supreme Court would not construe the Commerce power to have such expansive reach. The extension of the Commerce Clause in the manner the government suggests is unsupported by precedent and therefore beyond the scope of this court's proper function to grant. An expansive interpretation of the commerce power that will permit Congress to equate the individual financial decision to forego health insurance with commercial activity having a substantial effect on interstate commerce, must come from the Supreme Court. See Planned Parenthood of S.E. Pa. v. Casey, 947 F.2d 682, 692 (3d Cir. 1991), rev'd in part on other grounds, 505 U.S. 833 (1992) ("Unlike lower courts, the Supreme Court is free to change the standard or result from one of its earlier cases when it finds it to be 'unsound in principle [or] unworkable in practice.'" (quoting Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 546 (1985))). Current Commerce Clause precedent does not permit Congress to reach a pre-transaction stage in anticipation of participation in a market on grounds that the market is unique.

40

3.    **Essential to a Larger Regulatory Scheme and Necessary and Proper**

The government's final argument seeks refuge in the Supreme Court's declaration that conduct may be reached pursuant to the Commerce Clause if it is essential to a larger regulatory scheme. The Supreme Court has determined that Congress may regulate conduct *not* substantially affecting interstate commerce pursuant to the Commerce Clause power if failure to reach the conduct would undercut the regulatory scheme or leave a gaping hole in its functioning. See Lopez, 514 U.S. at 561; Raich, 545 U.S. at 22, 24-25.

The essential to a larger regulatory scheme doctrine, a doctrine of recent vintage, see Florida, --- F.3d at ---, 2011 WL 3519178, at *62, has its roots in the Necessary and Proper Clause. See Raich, 545 U.S. at 34-37 (Scalia, J., concurring); id. at 34 (stating that "Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities hat have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause"); see also Florida, --- F.3d at ---, 2011 WL 3519178, at *64. The Necessary and Proper Clause endows Congress with the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or officer thereof." U.S. CONST. art. I, § 8, cl. 18. Within the context of the Commerce Clause, the Necessary and Proper Clause requires only that the means chosen be "reasonably adapted to the attainment of a

41

legitimate end under the commerce power," <u>United States v. Comstock</u>, --- U.S. ---, 130 S. Ct. 1949, 1956-57 (2010), with the choice of means properly left to congressional judgment.  <u>Id.</u> at 1957.  "[T]he Necessary and Proper Clause does not give 'Congress . . . the authority to regulate the internal commerce of a State, as such,' but it does allow Congress 'to take all measures necessary or appropriate to' the effective regulation of the interstate market, 'although intrastate transactions . . . may thereby be controlled.'"  <u>Raich</u>, 545 U.S. at 37 (Scalia, J., concurring) (quoting <u>Shreveport Rate Case</u>, 234 U.S. 342, 353 (1914)).  The government argues that the individual mandate is essential to Congress's larger reform of the health care industry, thereby asserting that the provision is necessary and proper to the achievement of ends pursued under the Commerce Clause.  This argument was thoroughly refuted by the <u>Florida</u> majority opinion and the court adopts its analysis <em>in toto</em>.  <u>See</u> <u>Florida</u>, --- F.3d at ---, 2011 WL 3519178, at *62-66.

I pause briefly to note that the individual mandate functions as a partial funding mechanism.[15]  For this additional reason, it is clearly not essential to regulation of the broader market but it <em>is</em> linked to two key provisions in particular: the guaranteed issue and preexisting conditions reforms.  <u>See</u> 42 U.S.C. §§ 300gg-1(a), 300gg-3.  The guaranteed-issue provision prevents health insurers from denying coverage on the basis of health status, medical condition, medical history,

---

[15]  The Congressional Budget Office estimates that the penalty provision of the individual mandate will raise approximately four billion dollars in revenue.  (Tr. at 20-21).

disability, or genetic makeup, among other health status factors.  42 U.S.C. § 300gg-1(a).  Thus, every individual who applies for insurance, must be enrolled.  The pre-existing conditions provision prevents insurers from limiting or denying health insurance coverage on the basis of an individual's preexisting medical condition.  42 U.S.C. § 300gg-3.  Absent the individual mandate, or some other source of subsidy, enforcement of these guaranteed issue and preexisting conditions provisions will likely drive insurers from the market, threatening the stability of the health insurance market.  Hence, as currently written, these provisions are sustainable only in conjunction with the individual mandate.[16]

To the extent the court's conclusion inhibits creative—but unconstitutional—congressional solutions to complex and interwoven national issues, we are simply executing the proper function of judicial review.[17]  For

---

[16]  In light of other available sources of funding, e.g. invocation of the Tax and Spending Power, U.S. CONST. art. I, § 8, cl. 1, the individual mandate is not essential even to the guaranteed issue provisions.

[17]  Even a law passed with the highest and most noble intentions must be rendered void if constitutionally infirm:

It is the high duty and function of this court in cases regularly brought to its bar to decline to recognize or enforce seeming laws of Congress, dealing with subjects not intrusted to Congress, but left or committed by the supreme law of the land to the control of the states.  We cannot avoid the duty, even thought it requires us to refuse to give effect to legislation designed to promote the highest good.  The good sought in unconstitutional legislation is an insidious feature, because it leads citizens and legislators of good purpose to promote it, without thought of the serious breach it will make in the ark of our covenant, or the harm which will come from breaking down recognized standards.  In the maintenance of local self-government, on the one hand, and the national power, on the other, our country has been able

example, nothing prohibits Congress from redoubling its efforts and invoking

another enumerated power, such as the Tax and Spending Clause, <u>see</u> U.S. CONST.

art. I, § 8, cl. 1, to address the uninsured free rider issue.  If, as the Bachmans

suggest, the problem lies in Congress's inability to secure majority support for such

action, (<u>see</u> Doc. 49, at 7, 28), then perhaps the crisis is not sufficiently acute for

appropriate congressional resolution or, alternatively, there are less burdensome

options yet to be pursued.  This is a conundrum that is Congress's to resolve.

### G. <u>Severability</u>

The minimum coverage provision cannot stand as a valid exercise of

Congress's extensive powers under either the Commerce Clause or the Necessary

and Proper Clause.  The court must therefore decide whether the provision is

severable or whether the entire Act is rendered unconstitutional on the basis of the

defective provision.

"Generally speaking, when confronting a constitutional flaw in a statute, [the

court] tr[ies] to limit the solution to the problem, severing any 'problematic portions

while leaving the remainder intact.'" <u>Free Enter. Fund</u>, --- U.S. ---, 130 S. Ct. at 3161

(quoting <u>Ayotte v. Planned Parenthood of N. New England</u>, 546 U.S. 320, 328-29

(2006)).  The reasoning underlying severability decisions is threefold:

> First, we try not to nullify more of a legislature's work than is
> necessary, for we know that a ruling of unconstitutionality frustrates

---

to endure and prosper for near a century and a half.

<u>Bailey v. Drexel Furniture Co. (Child Labor Tax Case)</u>, 259 U.S. 20, 37 (1922).

the intent of the elected representatives of the people. . . .  Second, mindful that our constitutional mandate and institutional competence are limited, we restrain ourselves from rewriting [a] law to conform it to constitutional requirements even as we strive to salvage it . . . Third, the touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature.

Ayotte, 546 U.S. at 329-30 (citations omitted).  Partial invalidation is therefore the appropriate course of action, whenever feasible, as long as the deficiencies of one provision do not taint the validity of the remaining provisions.  Free Enter. Fund, --- U.S. at ---, 130 S. Ct. at 3161 (citing Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 504 (1985) and Champlin Refining Co. v. Corp. Comm'n of Okla., 286 U.S. 210, 234 (1932)).  The standard for severability is well established: "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law."  Alaska Airlines, Inc. V. Brock, 480 U.S. 678, 684 (1987) (internal quotations and citations omitted).  Thus, the court's task is to consider whether the remaining provisions of the Act will function in accordance with the intent of Congress, particularly whether, in the absence of the minimum coverage provision, Congress would have enacted the statute at all.  Id. at 685.

The Eleventh Circuit, the only circuit court to reach the severability question, concluded that the individual mandate provision was severable from the remainder of the Act.  Florida, --- F.3d at ---, 2011 WL 3519178, at *76-82.  The Florida majority determined that the lack of a severability clause, and the fact that prior versions of the Act contained a severability clause, did not influence the

45

severability question.  Id. at *78.  Having determined that the entire Act need not be declared unconstitutional, the Florida majority turned its attention to the severability of the individual mandate from the guaranteed issue and preexisting conditions insurance reforms.  Id.  Undoubtedly, the two insurance provisions can fully operate as law, the question however, is whether Congress would have enacted the provisions in the absence of the individual mandate.  The Florida majority answered that question in the affirmative.  The court noted that Congress did not include a non-severability clause stating that reforms are not severable from the mandate.  Id. at *79.  Moreover, the insurance reforms do not contain cross-references to the mandate or tie their implementation to the mandate's existence. Id.  The Florida majority reasoned that one of the basic objectives of the Act is to make insurance coverage available thereby reducing the number of uninsured.  Id. at *80.  The court concluded that the insurance reforms seek to achieve this objective, and that other provisions of the Act work to achieve some of the same objectives as the individual mandate.  Id.  The Florida majority noted that "the individual mandate has a comparatively limited field of operation vis-a-vis the number of uninsured," which is indicative that Congress would have enacted the reforms without the mandate.  Id.  The features of the individual mandates, such as its numerous exemptions and exceptions, "all serve to weaken the mandate's practical influence on the two insurance product reforms."  Id. at *81.  Finally, the Florida majority noted that the Congressional findings do not speak to the

46

severability question faced by the court.  Id.  Therefore, the Florida majority

concluded that only the individual mandate need be severed from the Act.

During oral argument on the present motions for summary judgment, the

government predictably asserted that the entire Act need not fall should the

minimum coverage provision be declared unconstitutional.  (Tr. at 56).  The

government conceded, however, that two insurance reform provisions—the

preexisting conditions provision and the guaranteed issue provision—"are

absolutely intertwined" with the minimum coverage provision and must be severed

should the individual mandate provision be severed.  (Id.)

Indisputably, the Patient Protection and Affordable Care Act, as amended, is

a massive piece of legislation.  Addressing severability with respect to each and

every provision would be a immense undertaking, and ultimately speculative at

best.  See Cuccinelli, 728 F. Supp. 2d at 789; Florida, --- F. Supp. 2d at ---, 2011 WL

285683 at *38 (stating that a line-by-line analysis of the Act would be tantamount to

rewriting the statute).  Significant to the severability analysis, the Act institutes

reforms in numerous other areas of the health care services and health insurance

markets beyond the minimum coverage provision mandate.  The Act establishes tax

incentives intended to increase the offering of employer-based health insurance.

See 26 U.S.C. § 45R.  The Act creates state-operated health benefits exchanges in an

effort to facilitate a competitive health insurance market for individuals and small

businesses.  See 42 U.S.C. § 18031.  The Act also creates incentives, such as tax

credits and federal payments, for individuals with financial hardships to obtain

health insurance, and expands Medicaid eligibility.  See 26 U.S.C. § 36B; 42 U.S.C. §

18071; 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).  These are but a few of the key

reforms—unrelated to the individual mandate—which Congress enacted in an

effort to improve delivery of health care services and to reduce the costs of those

services.

Given the breadth of the Act and the numerous provisions unrelated to the

minimum coverage provision, and in light of Congress's overarching intent to mend

the ailing health care services market, the court will exercise caution and sever only

the "problematic portions while leaving the remainder intact."  Ayotte, 546 U.S. at

329.  As previously noted, Congress clearly linked the individual mandate to the

guaranteed issue and preexisting conditions reform provisions because it is a

partial funding source for these provisions.  Given the current structure of the Act,

and with certain deference to the government's perspective of Congress's intent,

the fate of the guaranteed issue reforms rises and falls with the minimum coverage

provision.  Accordingly, the court finds that the minimum coverage provision,

guaranteed issue, and preexisting condition provisions must be severed from the

Act.

## V.   Conclusion

The Framers carefully constructed our national government with a system of checks and balances.  This court's role in that system is to assess the matters presented before it on the basis of the constitutional text and Supreme Court guidance, consonant with the principles of *stare decisis*.  See Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803).  The minimum coverage provision of the Patient Protection and Affordable Care Act exceeds Congress's authority under the Commerce Clause of the United States Constitution.  The court does not reach this conclusion because the alternative would be disastrous to this nation's future, such as the Bachman's prediction of America evolving into a socialist state.  (See Doc. 1 ¶¶ 8, 11, 12, 17).  These suggestions of cataclysmic results stemming from Article III authorization of an individual mandate are both unproductive and unpersuasive.[18] Should the Supreme Court determine that the Commerce Clause extends to anticipatory mandates, or, that the health care market is unique for purposes of Commerce Clause analysis, the Supreme Court will delineate clear limits to that

---

[18]  I recognize this hyperbolic rhetoric as the exercise of zealous advocacy and by no means seek to admonish counsel.  Moreover, the Bachmans are not alone in their foreboding predictions.  See, e.g., David B. Rivkin, Jr. & Lee A. Casey, Debate, *A Healthy Debate: The Constitutionality of an Individual Mandate*, 158 U. Pa. L. Rev. PennUmbra 93, 101 (2009) ("If Congress can mandate the purchase of health care insurance, it can similarly impose, under the Commerce Clause guise, an infinite array of other mandates, ranging from health club memberships to a requirement to consume a given quantity of fruits and vegetables annually.  This power to direct the use of people's resources . . . would turn everybody into a ward of the state, unable to exercise individual choices.").  However, such hyperbole serves only to fan populist flames and does precious little to advance the proper legal analysis.

power.  Until that occurs, the minimum coverage provision of the Patent Protection and Affordable Care Act cannot withstand constitutional scrutiny.  The court also concludes that § 5000A cannot be severed from the Act without also severing the guaranteed issue and preexisting conditions health insurance reforms.  The remaining portions of the Act will be left intact to function in accordance with the intent of Congress.

The nation undoubtably faces a health care crisis.  Scores of individuals are uninsured and the costs to all citizens are measurable and significant.  The federal government, however, is one of limited enumerated powers, and Congress's efforts to remedy the ailing health care and health insurance markets must fit squarely within the boundaries of those powers.  Based upon careful review of Commerce Clause jurisprudence, the court declares the individual mandate to be an unconstitutional extension of authority granted to the federal government under the Commerce Clause of the United States Constitution.

  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:     September 13, 2011

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BARBARA GOUDY-BACHMAN and GREGORY BACHMAN** | : | **CIVIL ACTION NO. 1:10-CV-763** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, KATHLEEN SEBELIUS, in her official capacity as the Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF THE TREASURY, and TIMOTHY F. GEITHNER, in his official capacity as Secretary of the United States Department of the Treasury** | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 13th day of September, 2011 upon consideration of the cross motions for summary judgment (Docs. 43, 47), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1.   Plaintiffs' motion for summary judgment (Doc. 47) is GRANTED.

2.   Defendants' motion for summary judgment (Doc. 43) is DENIED.

3.   The Clerk of Court is directed to enter JUDGMENT in favor of plaintiffs and against defendants.

4.     The Clerk of Court is directed to CLOSE the case.


                                       __S/ Christopher C. Conner__
                                       CHRISTOPHER C. CONNER
                                       United States District Judge